## MERRILL LYNCH, PIERCE, FENNER & SMITH

v.

### Reese M. STIDHAM, III; H. Paige Scarborough; John A. Bruner.

#### Civ. A. No. 80–74–ATH.

United States District Court, M. D. Georgia, Athens Division.

Jan. 15, 1981.

C. B. Rogers, Paul W. Stivers, Phillip S. McKinney, Rogers & Hardin, Atlanta, Ga., for plaintiff.

William A. Clineburg, Jr., King & Spalding, Atlanta, Ga., for defendants.

---

3. Rule 54(c), Federal Rules of Criminal Procedure.

OWENS, Chief Judge:

Merrill Lynch, Pierce, Fenner & Smith, Inc.,[1] (hereinafter Merrill Lynch), a nationwide stock brokerage firm, filed its complaint in this court on Monday, September 15, 1980, seeking a preliminary and permanent injunction against defendants and former Merrill Lynch account executives Reese M. Stidham, III, H. Paige Scarborough, and John A. Bruner, who on Friday afternoon, September 12, 1980, left Merrill Lynch's Athens, Georgia office employment; opened an Athens, Georgia, office for Robinson-Humphrey, Inc., a major Merrill Lynch competitor headquartered in Atlanta, Georgia; and began soliciting Merrill Lynch's customers formerly serviced by each of them while employed by Merrill Lynch.

Defendants Stidham, Scarborough and Bruner without prior training or experience in the marketing of securities, were first hired by the Athens, Georgia, office of Merrill Lynch in 1974, 1977, and 1978 respectively. At the time of hiring, each defendant signed an employment contract containing employment restrictive convenants which Merrill Lynch contends are legally enforceable under Georgia law and the basis for the injunctive relief it seeks. The defendants acknowledge the execution of their respective contracts but assert that each of the restrictive provisions is overly broad and unenforceable under Georgia law.

Defendant Stidham's agreement in its pertinent parts provides:

"In consideration of Merrill Lynch, Pierce, Fenner & Smith Incorporated and/or its affiliated companies (hereinafter referred to as Merrill Lynch) employing me in sales capacity and in consideration of (a) the salary to be paid by Merrill Lynch, (b) for other good and valuable consideration, it is hereby agreed that:

1. All records of Merrill Lynch, including the names and addresses of its clients, are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination for any reason of my employment with Merrill Lynch, and that none of such records nor any part of them is to be removed from the premises of Merrill Lynch either in original form or in duplicated or copied form, and that the names, addresses, and other facts in such records are not to be transmitted verbally except in the ordinary course of conducting business for Merrill Lynch.

2. In the event of termination of my services with Merrill Lynch for any reason, I will not solicit any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch in any community or city served by the office of Merrill Lynch, or any subsidiary thereof, at which I was employed at any time for a period of one year from the date of termination of my employment. In the event that any of the provisions contained in this paragraph and/or paragraph (1) above are violated I understand that I will be liable to Merrill Lynch for any damage caused thereby."

Defendant Scarborough and Bruner's agreements in their identical pertinent parts, provide:

"In consideration of Merrill Lynch, Pierce, Fenner & Smith Incorporated and/or its affiliated companies (hereinafter referred to as Merrill Lynch) employing me in a sales capacity or as a trainee for a sales position, and in consideration of (a) the salary to be paid by Merrill Lynch, (b) the cost of my schooling and training to be received as a member of the training school of Merrill Lynch, and (c) the compensation, living

---

1. The plaintiff is a Delaware corporation having its principal place of business in New York which acts as a securities, commodity futures and bond broker and investment banker. It is a subsidiary of Merrill Lynch Co. which through affiliated corporations provides real estate tax shelters, deals in gold bullion, renders economic advisory services, affords asset management and sells insurance.

allowance and other benefits to be received by me while attending the school and during the pre-school and post-school training, and (d) in further consideration of the opportunities which will be afforded me during and after my schooling period and (e) for other good and valuable consideration, it is hereby agreed that:

1. All records of Merrill Lynch, including the names and addresses of its clients, are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination for any reason of my employment with Merrill Lynch, and that none of such records nor any part of them is to be removed from the premises of Merrill Lynch either in original form or in duplicated or copied form, and that the names, addresses, and other facts in such records are not to be transmitted verbally except in the ordinary course of conducting business for Merrill Lynch.

2. In the event of termination of my services with Merrill Lynch for any reason, I will not solicit any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch in any community or city served by the office of Merrill Lynch, or any subsidiary thereof, at which I was employed at any time for a period of one year from the date of termination of my employment. In the event that any of the provisions contained in this paragraph and/or paragraph (1) above are violated I understand that I will be liable to Merrill Lynch for any damage caused thereby."

Each defendant was hired by Merrill Lynch as an account executive trainee; received extensive training from and at substantial expense to Merrill Lynch; and within approximately one year from initial employment was qualified, promoted to, and working as an account executive in Merrill Lynch's Athens, Georgia, office. Merrill Lynch assigned new Merrill Lynch customers or clients to each defendant, and each defendant obtained some new customers or clients by personal solicitation. At the time each defendant left Merrill Lynch's employment, they were each serving some two to three hundred customers and earning substantial monetary commissions [2] from doing so.

Prior to September 1980, Robinson-Humphrey did not have an Athens, Georgia office. Desirous of opening such an office, Robinson-Humphrey asked a friendly business man to contact defendant Stidham and ascertain whether or not he would be interested in leaving Merrill Lynch's employment and starting up an Athens, Georgia, office for Robinson-Humphrey. In mid-June 1980 Mr. Stidham was thus contacted, responded affirmatively and was invited to Robinson-Humphrey's Atlanta headquarters for further discussion. Between that first meeting and around July 15, 1980, Mr. Stidham had detailed discussions with Robinson-Humphrey officials about every phase of the opening of the Athens, Georgia office; mentioned the possible new Robinson-Humphrey office to defendants Scarborough and Bruner; and reported their positive interest to Robinson-Humphrey. On or about July 15 two Robinson-Humphrey officials met with Messrs. Stidham, Scarborough and Bruner at the Athens County Club. At that meeting Mr. Stidham was hired as manager of the new office, guaranteed $84,000 for his first year of employment and promised an accelerated commission payout schedule. Defendants Scarborough and Bruner while not hired at that meeting, were led to believe they had job offers and would each receive a guaranteed $15,000 minimum for the first three months of employment, plus an accelerated commission payout schedule; in August they each accepted these offers.

---

2. Defendant Stidham earned just prior to leaving Merrill Lynch in excess of $7,000 a month or $84,000 a year. Deposition of Reese Stidham, pp. 78–79. Defendant Bruner earned just prior to leaving Merrill Lynch approximately $5,500 a month or $66,000 a year. Deposition of John Bruner, p. 5. Defendant Scarborough earned just prior to leaving Merrill Lynch approximately $4,500 a month or $54,000. Deposition of Paige Scarborough, p. 3.

The defendants continued in Merrill Lynch's employment while Robinson-Humphrey did all that was necessary to locate, construct, and furnish its new office and prepare for its opening. The first that Merrill Lynch knew was on Friday afternoon, September 12, 1980, when the defendants resigned.

Prior to resigning the defendants had copied Merrill Lynch's records called "holding pages" on which the customer's name and inventory of all securities owned is shown and had furnished to Robinson-Humphrey the names and addresses of customers serviced by them. Using that information, letters announcing the opening of Robinson-Humphrey's new office were prepared and ready for mailing when they resigned. Some customers had been personally contacted, told of the impending opening of a Robinson-Humphrey office and asked to authorize a transfer of securities held by Merrill Lynch to Robinson-Humphrey. Defendant Bruner even went so far as to sign the name of some of the customers serviced by him, to a required transfer form which only the customer can sign.

After notice to defendants' attorneys, Merrill Lynch on September 17, 1980 filed its complaint and motion for preliminary injunctive relief. Following an in-chambers hearing, the court on September 17 granted a preliminary injunction which upon appeal and for unstated reasons was stayed by the Fifth Circuit Court of Appeals on October 14, 1980.

Upon motion by the plaintiff a hearing upon plaintiff's motion for permanent injunctive relief was set for November 13, 1980, at 9:30 a. m.

Defendants on or about November 1, 1980, petitioned the Fifth Circuit Court of Appeals to mandamus this trial judge to hold no further hearings in this case prior to a decision on the merits of defendants' pending appeal being rendered. In affidavits attached to their petition each defendant stated:

"5. Prior to the issuance of the injunction, some of my clients were in the process of transferring their accounts from Merrill Lynch to Robinson-Humphrey in order to continue doing business with me. During the period in which the injunction was in effect, those clients were unable to do business with me. Since the staying of the injunction, most, but not all, of those clients have elected to continue doing business with me.

"6. A number of my clients have been unwilling to transfer their accounts from Merrill Lynch to Robinson-Humphrey since the filing of this lawsuit.

"7. If I am enjoined again from doing business with my clients, I seriously doubt that they will be willing to again resume doing business with me once the injunction is permanently lifted.

"8. If I am enjoined again from doing business with my clients, I will seriously consider quitting the brokerage business."

This indicates that defendants are of no value to Robinson-Humphrey if they cannot solicit Merrill Lynch's customers with whom they had contact while employed at Merrill Lynch.

On November 7, 1980, defendants' mandamus petition was denied and on November 13 plaintiff's motion came on to be heard. This in its entirety constitutes the court's Rule 65, Federal Rules of Civil Procedure, order.

This court has jurisdiction under 28 U.S. C.A. § 1332 in that there is complete diversity of citizenship between plaintiff and each defendant, and more than $10,000.00 in damages is alleged to have been sustained by the plaintiff on account of the breach within this court's jurisdiction of the contracts in question.

▮▮▮▮ Although the contracts each state that they will be enforced under New York law, this being a diversity case the court is required to apply Georgia's conflict of law rule, see, *Residential Industrial Loan Co. v. Brown*, 559 F.2d 438, 440 (5th Cir. 1977), which rule provides that the law of the state where a contract is made and performed governs the validity and interpretation of the contract, except when the result is contrary to the public policy of Georgia.

See, *Delta Airlines, Inc. v. McDonnell Douglas Corp.*, 503 F.2d 239, 243 (5th Cir. 1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451. These contracts were executed and to be performed in Georgia. Georgia law thus governs their enforceability. See, *Dothan Aviation Corp. v. Miller*, 620 F.2d 504 (5th Cir. 1980).

As to contracts in general, Georgia law provides that "the construction of a contract is a question of law for the court. Where any matter of fact is involved (as the proper reading of an obscurely written word), the jury should find the fact." 1933 Ga.Code Ann. 20–701. The term "obscurely written word" is usually construed as referring to ambiguous words or provisions of a contract. Unless there are ambiguous expressions in a contract, the construction of a contract is for the court and not for the jury. See, *Cincinnati Ins. Co. v. Davis*, 153 Ga.App. 291, 265 S.E.2d 102 (1980); *Pisano v. Security Management Co., Inc.*, 148 Ga. App. 567, 251 S.E.2d 798 (1978); *General Wholesale Beer v. Theodore Hamm Co.*, 567 F.2d 311 (5th Cir. 1978).

"A contract is not ambiguous, even though difficult to construe, unless and until an application of the pertinent rules of interpretation leaves it uncertain as to which of two or more possible meanings represents the true intention of the parties. There is no construction required or even permissible when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation." (citations omitted). 153 Ga.App. 294, 265 S.E.2d 105.

When needed the pertinent rules of interpretation are found in 1933 Ga.Code Ann. § 20–704. "The cardinal rule of construction is to ascertain the intention of the parties. If that intention be clear, and it contravenes no rule of law, and sufficient words be used to arrive at the intention, it shall be enforced." 1933 Ga.Code Ann. § 20–702.

Viewed as a whole each of the contracts in question is a contract of employment signed by each defendant at the time of being employed as an account executive trainee or as an account executive and intended by plaintiff and defendants to govern their employer-employee relations. Each agreement is clearly labeled either "ACCOUNT EXECUTIVE TRAINEE AGREEMENT" or "ACCOUNT EXECUTIVE AGREEMENT" and was thus intended by both plaintiff and defendants to apply to each defendant while employed by Merrill Lynch as an account executive trainee and as an account executive.

## PARAGRAPH 1 OF THE AGREEMENT

Paragraph 1 of each agreement provides: "All records of Merrill Lynch, including the names and addresses of its clients, are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination for any reason of my employment with Merrill Lynch, and that none of such records nor any part of them is to be removed from the premises of Merrill Lynch either in original form or in duplicated or copied form, and that the names, addresses, and other facts in such records are not to be transmitted verbally except in the ordinary course of conducting business for Merrill Lynch." It is an acknowledgment and agreement between plaintiff Merrill Lynch and each defendant employee that all of Merrill Lynch's records "are and shall remain the property of Merrill Lynch at all times during my employment and after termination for any reason of my employment with Merrill Lynch." The intention of the parties was to agree that at the beginning of employment all of Merrill Lynch's records to which the employee will now be given access because of his employment, are Merrill Lynch's property and the employee by working for Merrill Lynch will acquire no ownership interest in any of Merrill Lynch's records. The further intention of the parties was to agree that at such time as employment ceases, Merrill Lynch's records continue to be Merrill Lynch's property and the employee neither upon or after termination for any reason—voluntary or involuntary termination—will have any property interest in such records. Since no one other

than an employee has access to the records of Merrill Lynch and that right of access ends with cessation of employment, this part of the agreement covers only the period of time during which the employee is employed and like the employment relationship, that period terminates when employment terminates.

The further intention of the parties in paragraph 1 was to agree that Merrill Lynch's records, in whole or in part, will not be removed from Merrill Lynch's premises in either their original, duplicated or copies form. "Except in the ordinary course of conducting business for Merrill Lynch," the parties agreed that the contents of Merrill Lynch's records will not even be verbally disclosed. That "records" includes names and addresses of Merrill Lynch's clients is expressly mentioned not once but twice in that paragraph.

█ Paragraph 1 is thus an agreement for the employee to keep Merrill Lynch's records and all information contained therein, confidential throughout the period of his employment. It is a non-disclosure agreement which if reasonable can be separately enforced from the other paragraphs of the agreement. See, *Nolan v. Meyners-Robinson Co.*, 246 Ga. 49, 268 S.E.2d 656 (1980). Since paragraph 1 thus construed is nothing more than an agreement requiring confidentiality *during employment*, it is in this court's best judgment unquestionably reasonable and under Georgia law a proper and appropriate basis for injunctive relief.

## PARAGRAPH 2 OF THE AGREEMENT

Paragraph 2 of said Agreement provides:

"In the event of termination of my services with Merrill Lynch for any reason, I will not solicit any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch in any community or city served by the office of Merrill Lynch, or any subsidiary thereof, at which I was employed at any time for a period of one year from the date of termination of my employment. In the event that any of the provisions contained in this paragraph and/or paragraph (1) above are violated I understand that I will be liable to Merrill Lynch for any damage caused thereby."

Unlike paragraph 1 which applies to the period of time during which the employee works for Merrill Lynch, paragraph 2 was intended by the parties to apply at and after such time as the employee's employment ceases whether voluntarily or involuntarily, *i. e.*, "[i]n the event of termination of my services with Merrill Lynch for any reason . . . ." The period of time specified and intended by the parties is "for a period of one year from the date of termination of my employment." After termination and during that one year period, what did the parties intend to agree? The parties intended to agree that the employee "will not solicit any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch."[3] The employee thus agrees to refrain from soliciting not any and all Merrill Lynch customers wherever located—as defendants strongly suggest—but only the Merrill Lynch clients or customers he served, or whose names as clients or customers became known to him while employed with Merrill Lynch. Refrain from soliciting for what? By acknowledging that "I understand that I will be liable to Merrill Lynch for any damage caused thereby" the employee and employer intended that the

---

**3.** While defendants' counsel has vigorously argued that the language prohibiting solicitation of "clients . . . whose name became known to me while in the employ of Merrill Lynch" is overbroad, the court disagrees. Even assuming that the language was overbroad in a non-competition sense, a unanimous Georgia Supreme Court has approved as reasonable such language for non-disclosure. *Nolan v. Meyners-Robinson*, supra. Furthermore, language similar to the instant language which restricts solicitation of "clients whom I served while in the employ of Merrill Lynch" has been held as reasonable by the Georgia courts. *Uni-Worth Enterprises v. Wilson*, 244 Ga. 636, 261 S.E.2d 572 (1979). The court by reconstructing without "bluepenciling" the separate clauses concludes that the specific language used in paragraph 2 is reasonable under a combined non-disclosure non-competition scheme.

employee refrain from soliciting for the sale of securities to the same extent that the employee solicited those same people while employed by Merrill Lynch, because only by doing so can the ex-employee damage and be liable to Merrill Lynch. No other solicitation can legally damage Merrill Lynch.

As thus construed is paragraph 2 enforceable by this court?

In approaching this question the court has carefully considered the many Georgia cases construing post-employment employee restrictive covenants, including particularly *Fuller v. Kolb*, 234 S.E.2d 517, 238 Ga. 602 (1977), and every subsequent case reported, through and including 268 S.E.2d 70 (August 28, 1980). The most complete relevant summary of Georgia law as set forth in those cases seems to this court to be found in *Howard Schultz & Assoc. v. Broniec*, 239 Ga. 181, 183, 236 S.E.2d 265, 267 (1977), to wit:

"[2] 1. By both constitutional and legislative provision, Georgia prohibits contracts or agreements in general restraint of trade. Const.1976, Art. III, Par. VIII, Code Ann. § 2–1409; Code Ann. § 20–504. Georgia courts have consistently held that the prohibition does not impose an absolute bar against every kind of restrictive agreement. A covenant to compete ancillary to an employment contract is enforceable only where it is strictly limited in time and territorial effect and is otherwise reasonable considering the business interest of the employer sought to be protected and the effect on the employee. *Edwards v. Howe Richardson Scale Co.*, 237 Ga. 818, 820, 229 S.E.2d 651 (1976); *Orkin Exterminating Co. v. Pelfrey*, 237 Ga. 284, 227 S.E.2d 251 (1976).

"[3] Insofar as territorial restrictions are concerned, some of them relate to the territory in which the employee was employed; others relate to the territory in which the employer does business. The former generally will be enforced. *Edwards v. Howe Richardson Scale Co.*, supra; *Dixie Bearings, Inc. v. Walker*, 219 Ga. 353, 356, 133 S.E.2d 338 (1963). The latter generally are unenforceable absent a showing by the employer of the legitimate business interests sought to be protected. *Taylor Freezer Sales Co., Inc. v. Sweden Freezer Eastern Corp.*, 224 Ga. 160, 160 S.E.2d 356 (1968); *Ellison v. Labor Pool of America, Inc.*, 228 Ga. 147, 184 S.E.2d 572 (1971); *Durham v. Stand-By Labor*, 230 Ga. 558(1), 198 S.E.2d 145 (1973). It appears that the justification for this difference in treatment is that a court will accept as prima facie valid a covenant related to the territory where the employee was employed as a legitimate protection of the employer's investment in customer relations and good will. *Thus a court will enforce an agreement prohibiting an employee from pirating his former employer's customers served by the employee*, during the employment, at the employer's direct or indirect expense. Conversely, a court will not accept as prima facie valid a covenant related to the territory where the employer does business where the only justification is that the employer wants to avoid competition by the employee in that area." (emphasis added).

In considering employee restrictive covenants the Supreme Court of Georgia in a case relied upon by plaintiffs, *Kirshbaum v. Jones*, 206 Ga. 192, 56 S.E.2d 484 (1949), unanimously upheld a restrictive covenant similar to that here under consideration, to wit:

"... The contract provided that the employee would not, for a period of one year following the termination of his employment with the petitioners, 'solicit or attempt to solicit the business or patronage of any of the customers of the employer heretofore served by the employee during his term of employment.' Unquestionably the restraint is reasonable as to its time limitation. *Orkin Exterminating Co. v. Dewberry*, 204 Ga. 794, 51 S.E.2d 669. With respect to the territorial limitation, the employee was prohibited from soliciting the employer's customers whom he had served, and the territory would necessarily be limited to that specific area. The territorial limitation im-

posed by the contract in the present case is even more limited, and therefore more reasonable, than what was held to be a reasonable limitation in those cases where the restriction was not only against soliciting the employer's customers, but those persons or places of business in a defined area such as a part of the State, a county, or a municipality. See, in this connection, *Shirk v. Loftis Bros. & Co.*, 148 Ga. 500, 97 S.E. 66; *National Linen Service Corp. v. Clower*, 179 Ga. 136, 175 S.E. 460; *Jones v. Primrose Dry Cleaning Co.*, 181 Ga. 103, 181 S.E. 577; *Franco v. Fulton Bakery Co.*, 190 Ga. 298, 9 S.E.2d 240; *Griffin v. Vandegriff*, 205 Ga. 288, 289, 53 S.E.2d 345." 56 S.E.2d at 485.

Then in 1977, the Supreme Court of Georgia in *Fuller v. Kolb*, 238 Ga. 602, 234 S.E.2d 517, considered the validity of the following covenant:

"The employee agrees that for a period of two years subsequent to the termination of this agreement, he will not render public accounting services, either as a practitioner, or as an employee of another practitioner, for any organization or individual which was a client of Fuller and DeLoach or of a predecessor firm at the time of termination or which had been a client within a year thereto ..." The covenant also provided for injunctive relief and liquidated damages upon breach."

held that:

In Georgia, contracts which tend to lessen competition or which are in restraint of trade are against public policy and are void. Georgia Constitution, Art. IV, Sec. IV, Par. I (Code Ann. § 2–2701 (Rev.1973); Code Ann. § 20–504 (Cum.Supp.1976). Restrictive covenants in employment contracts are in partial restraint of trade and are enforceable 'only if strictly limited in time and territorial effect and (are) otherwise reasonable considering the business interest of the employer sought to be protected and the effect on the employee.' *Orkin Exterminating Co. v. Pelfrey*, 237 Ga. 284, 285, 227 S.E.2d 251, 252 (1976). See also

*McNease v. National Motor Club of America, Inc.*, 238 Ga. 53, 231 S.E.2d 58 (1976).

*The covenant which we are asked to consider in this case, as it is written, has no territorial limitation. The absence of such a limitation renders it void.* See *Colonial Life & Accident Ins. Co. v. Byrd*, 227 Ga. 198, 179 S.E.2d 746 (1971); *Edwin K. Williams & Co.—East v. Padgett*, 226 Ga. 613, 176 S.E.2d 800 (1970). The problem inherent in restrictive covenants which do not have territorial limitations is one of notice to the former employee. See, e. g., *Ellison v. Labor Pool of America, Inc.*, 228 Ga. 147, 184 S.E.2d 572 (1971); and *WAKE Broadcasters, Inc. v. Crawford*, 215 Ga. 862, 114 S.E.2d 26 (1960). This is particularly true in this case where appellant has offices in four different cities and the covenant prohibits dealings with any organization or individual which had been a client of appellant for a year preceding the termination of employment. The burden imposed on Kolb to determine whether he is in violation of the covenant in accepting a particular client is unreasonable as written." (emphasis added).

and even though the language of the covenant is obviously broader than the *Kirshbaum* covenant, went on to say:

"Appellant argues that this case should be controlled by *Kirshbaum v. Jones*, 206 Ga. 192, 56 S.E.2d 484 (1949). In *Kirshbaum*, the court upheld a restriction which was written without a territorial limitation. There the court found '[w]ith respect to the territorial limitation, the employee was prohibited from *soliciting* the employer's customers *whom he had served*, and the territory would necessarily be limited to that specific area.' (Emphasis supplied). The opinion in *Kirshbaum* does not point out either the type of business or the locality involved in that case. Appellant observes, and we agree, that *Kirshbaum* is in apparent conflict with later cases such as *Colonial Life* and *Williams*, supra. Therefore, *Kirshbaum* is disapproved insofar as it intimates that a restrictive covenant in an employment

contract is enforceable without an explicit territorial limitation."

Justice Jordan in his lone dissent stated:

"While contracts in restraint of trade are against policy and void under our Constitution, yet reasonable restrictive covenants in employment contracts have been recognized as an exception to this principle from the time of the Industrial Revolution and possibly before. The majority opinion in this case is but another example of 'nit picking' such contracts by this court to the extent that these contracts have been rendered totally inoperative and ineffective. Ten Philadelphia lawyers could not draft an employer-employee restrictive covenant agreement that would pass muster *under the recent rulings of this court.* (Emphasis added).

*Kirshbaum,* in this court's opinion, is distinguished from *Fuller v. Kolb, supra,* by the fact that in *Kirshbaum* the employee was restricted from soliciting "any of the customers of the employer *heretofore served by the employee* . . . ." (emphasis added), whereas in *Fuller, supra,* the employee was restricted from rendering public accounting services "for any organization or individual which was a client of Fuller and DeLoach [his employer] . . . or of a predecessor firm...," language that includes those served by the employee and anyone else who was a client of his employer accounting firm at any of its several offices. The restriction prohibited competition in all respects and was simply broader than was necessary for the protection of the employer, the basic general reason for holding such contract provisions unenforceable. See, *Puritan/Churchill Chemical Co. v. Eubank,* 245 Ga. 334, 265 S.E.2d 16 (1980). Its defect was not the absence of a specific geographical area. The last paragraph of *Fuller v. Kolb* is thus unnecessary to that decision and *obiter dictum* as to this case and this contract.

That the Supreme Court of Georgia subsequently decided that "an explicit territorial limitation" is not an inflexible, mandatory requirement of a reasonable, enforceable restrictive employee covenant is shown by the court's subsequent 1979 decision in *Barry v. Stanco Communications Products, Inc.,* 243 Ga. 68, 252 S.E.2d 491. There the court considered a contract in which the employees

". . . entered into an employment contract with Stanco Communications Products, Inc. under which they were given the right to solicit customers for Stanco in every county of Georgia. The contract contained a covenant not to compete, whereby Barry and Chess agreed that for a period of two years immediately following the termination of their employment, they would not call upon or divert any customers of Stanco in any county of Georgia, for the purpose of soliciting or selling products similar to products sold, distributed or installed by Stanco. Appellants further agreed not to engage in the business of selling, distributing or servicing communications or electronic equipment similar to that handled or distributed by Stanco at the time of termination, nor to compete with Stanco in any manner for a two-year period in the counties covered by the employment contract." 252 S.E.2d 492.

In considering the reasonableness of the territorial restriction, the court stated:

"The reasonableness of territory depends, not so much on the geographical size of the territory, as on the reasonableness of the territorial restriction in view of the facts and circumstance surrounding the case. *Thomas v. Coastal Industrial Services,* 214 Ga. 832, 108 S.E.2d 328 (1959).

"Insofar as territorial restrictions are concerned, those which relate to the territory in which the employee was employed are generally upheld. (citations omitted). It is undisputed that, in this case appellants were employed to and did solicit business throughout the entire State of Georgia." Id. 252 S.E.2d at 493.

and then after reviewing the particular facts and circumstances and finding "that the territorial limitation in this case was reasonable, and a legitimate protection of Stanco's investment in customer relations . . . ." went on to state:

"In so holding, we disapprove and overrule the decisions of *Orkin Exterminating Co. v. Dewberry*, 204 Ga. 794, 51 S.E.2d 669 (1949); *Taylor Publishing Co. v. Jones*, 226 Ga. 832, 177 S.E.2d 655 (1970); *Artistic Ornamental Iron Co. v. Wilkes*, 213 Ga. 654, 100 S.E.2d 731 (1957), to the extent that they hold a covenant not to compete which applies to the whole state is always void and will never be enforced. *We find the interests of the state will be better served by judging the reasonableness of the territorial restrictions considering the nature of the business involved, and the facts surrounding each case.*" (Emphasis added). Id. 252 S.E.2d at 494.

The facts of this case as herein found show that the defendants were each employed as account executives by Merrill Lynch at and only at its Athens, Georgia, office. As an account executive each defendant was trained at substantial expense to Merrill Lynch; furnished clients of Merrill Lynch to serve; served some 200–300 clients located not only in Athens but also in other places, some far and some near, by selling them securities; and earned substantial monetary compensation for doing so.

Each defendant after copying the names and addresses of each Merrill Lynch client served by him and communicating those to his new employer, Robinson-Humphrey, Inc., so that solicitation letters could be ready for mailing when the defendants left Merrill Lynch; after copying other information in Merrill Lynch's records; and after soliciting some Merrill Lynch clients for Robinson-Humphrey; told Merrill Lynch on Friday afternoon of their desire to terminate their employment. On Saturday Robinson-Humphrey solicitation letters were mailed by the defendants who were each at work for Robinson-Humphrey soliciting the same people they were serving the day before as Merrill Lynch clients and clearly violating the second paragraph of each of their employment contracts.

Merrill Lynch has a substantial investment in customer relations and good will. The one year period of time set forth in paragraph 2 is unquestionably reasonable and the restrictions imposed viewed in the light of the facts and circumstances of this case and of Georgia law are most reasonable in every respect. *Kirshbaum v. Jones, supra.*

An injunction will not stop these defendants from working for Robinson-Humphrey as account executives. It will only stop them from pirating the customers of Merrill Lynch served by them or who they came to know as Merrill Lynch clients during their Merrill Lynch employment. They are free to solicit any and every person in these United States excepting only the two to three hundred Merrill Lynch customers they each served. After one year they can even solicit them.

The court has carefully considered the asserted defenses of failure of consideration, waiver, estoppel, and unclean hands. The consideration for these agreements as factually found is more than adequate. Neither waiver nor estoppel has been shown. There is no evidence of unclean hands in Merrill Lynch's conduct as to these defendants. No other conduct of Merrill Lynch is relevant to this dispute. *Atlanta Association of Fire Ins. Agts. v. McDonald*, 181 Ga. 105, 181 S.E. 764 (1935); *Partain v. Maddox*, 227 Ga. 623, 182 S.E.2d 450 (1971); *Mitchell Bros. Film Group v. Cinema Adult Theatre*, 604 F.2d 852, 863 (5th Cir. 1979), cert. denied, 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980).

Merrill Lynch is being damaged by the recited conduct of these defendants. Those damages cannot be ascertained or estimated with any fair degree of certainty. They can be established only by a trial before the jury that defendants have demanded. Merrill Lynch has no adequate remedy at law. *See, Treasure Valley Potato Bargaining Assoc. v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 218 (10th Cir.), cert. denied, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974); *Atlantic Coast Line Railroad Co. v. Gunn*, 185 Ga. 108, 110, 194 S.E. 365, 367 (1938).

Merrill Lynch is therefore entitled to a permanent injunction commanding defend-

ants to refrain from violating paragraph 1 and to an injunction commanding defendants through and including September 12, 1981, to refrain from violating paragraph 2.

Accordingly, pursuant to Rule 65, Federal Rules of Civil Procedure, the individual defendants, their agents, servants, employees, and attorneys, and all other persons in active concert with them who receive actual notice of this order by personal service or otherwise, are hereby permanently enjoined:

(A) From directly or indirectly violating paragraph 1 of the subject contracts by in any way using all or any portion of Merrill Lynch's records copied, extracted, or verbally transmitted by either defendant to Robinson-Humphrey or by using any record created by defendants or Robinson-Humphrey from Merrill Lynch's records copied, extracted or verbally transmitted by either defendant to Robinson-Humphrey. It is the court's intention that no information directly, indirectly, or derivatively obtained from Merrill Lynch's records by defendants be retained in any form or fashion by them or by their new employer.

(B) Until 12:00 noon, September 12, 1981, from soliciting any client of Merrill Lynch actually served by either defendant or any client of Merrill Lynch whose name became known to either defendant, while employed at Merrill Lynch, for the sale of securities similar to those sold and dealt in by Merrill Lynch in its Athens, Georgia, office during the employment of defendants in that office.

This injunction shall become effective at such time as plaintiff has given security in the amount of $10,000.00 in accordance with Rule 65(c), Federal Rules of Civil Procedure.